95          25
31 SC ²106

## Shillingford *versus* Good, Trustee, &c.

1. On December 7th 1869, H. leased a coal tract to S., at a fixed royalty. S. commenced to mine, rendered monthly statements, and paid the royalty until the death of H., in September 1873.    H. devised his real estate, including the leased tract, to his three daughters, "the coal lease thereon to remain in the hands of my trustee * * * until all the legacies in this will are paid and the terms of leases expired."    In November 1873, S. alleged that he had mistaken the true division line between the H. tract and an adjoining one and had mined about ten acres on the latter tract and erroneously paid royalty therefor, and refused to pay any further royalty until reimbursed.    To settle these differences, on the 11th July 1874, an agreement was executed fixing the boundary line and exchanging two tracts of coal land.    In this agreement certain married women joined without acknowledgment.    After the death of H. it was alleged that S., almost from the commencement of his lease, had, by false weights, measures and certificates, systematically defrauded H., and after the death of the latter his trustee brought suit.    *Held*, that he was the proper party to sue for and was entitled to recover the royalty which had accrued before as well as after his testator's death.

2. The monthly returns, which purported to be correct statements of the coal mined each month, and payments thereon, received without objection, in the absence of full and satisfactory evidence of fraud or mistake, were conclusive.

3. S. alleged that the agreement of July 11th 1874 did not establish the division line in dispute, and that the married women were not bound by the conveyance, nor by the division line alleged to have been established by said agreement.    *Held*, that said agreement was inoperative as a conveyance of land, because it lacked the required acknowledgment, yet, if fairly procured, it was evidence of a settlement of the disputed boundary line.

4. There is nothing in the law which forbids or prevents a married woman from settling a disputed boundary line without a formally acknowledged conveyance.    Such an agreement is not a conveyance, but an admission of a fact.

5. It made no material difference that some of the misrepresentations complained of, whereby it was alleged the agreement was fraudulently procured, were made long before the agreement was signed.    It is enough if their effect continued and was operative at the time it was signed : Stubbs *v.* King, 14 S. & R. 206, followed.

May 27th 1880.  Before Mercur, Gordon, Trunkey, Sterrett and Green, JJ.  Sharswood, C. J., and Paxson, J., absent.

Error to the Court of Common Pleas of *Huntingdon county:* Of May Term 1879, No. 182.

Covenant brought September 19th 1877, by Dr. D. R. Good, trustee under the will of Dr. Daniel Houtz, deceased, against H. H. Shillingford, to recover royalty on bituminous coal mined by the defendant under a lease executed by Houtz to Shillingford, dated December 7th 1869.  The defendant pleaded "covenants performed."

Under the terms of the above-mentioned lease, certain coal lands in Clearfield county, Pennsylvania, which were known as the Bickham, Howell and Johnston tracts, were leased "for the purpose of mining, shipping and transporting coal from said lands, or other lands owned and operated by the party of the second part, his heirs and assigns, with the use of timber for mining purposes."

In consideration whereof, Shillingford agreed to proceed within thirty days to explore and prove the coal in said lands, "and when the mines shall have been opened and all necessary improvements made at the cost of the party of the second part, to operate the same in a proper and workmanlike manner," and pay a royalty of fifteen cents per gross ton.

Shillingford commenced to ship coal in January 1871.  As it came from the mines the coal was weighed on his own scales by a weighmaster of his own selection.  From time to time, until the death of Dr. Houtz, the defendant rendered monthly statements of the amount of coal mined; each statement being accompanied with a check for the amount of the royalty thereon.

On September 20th 1873, Dr. Houtz died, leaving a will, which provided, inter alia, as follows:

"I give and bequeath to my three daughters, Hannah E. Brisbin, Eliza B. Good and Clara H. McAteer, jointly, and their heirs and assigns, all my lands in Woodward township, Clearfield county, Pennsylvania, namely: The Samuel Emlin tract, the Chandler farm, the Philip Loast, William Johnston, Jacob R. Howell and George Bickham tracts, * * * all equally and jointly, the coal leased thereon to remain in the hands and care of my trustee, together with my L. & A. Morrison paper maturing, until all the legacies in this will are paid, and term of leases expired."

After the death of Dr. Houtz, Shillingford refused to pay the royalty until it should be legally determined whether it should be paid to his executors or the trustee under his will.  A case stated was submitted to the court below, and in an opinion filed February 19th 1874, it was decided that the royalty was payable to the trustee.

The plaintiff, Good, alleged that between December 7th 1869 and July 15th 1877, Shillingford had mined and shipped from said

[Shillingford *v.* Good.]

land 718,275 tons of coal of 2240 pounds each, the royalty on which amounted to $107,421.25, but that he had only accounted for 279,727 tons, the royalty upon which was $41,959.05, and that he had, therefore, failed to account for 438,548 tons, or to pay the royalty thereon, amounting to $65,728.20.   On behalf of the plaintiff evidence was offered to show that a system of frauds had been adopted in weighing and measuring the coal mined and in accounting therefor.   The estimates of engineers as to the quantity of coal mined were widely different.

When the lease was executed Shillingford was president of the Moshannon Land and Lumber Company which owned the Thomas Edmundson tract, immediately adjoining the tract leased to him by Dr. Houtz.   In November 1873, Shillingford claimed that he had discovered that the true division line between said tracts was not as supposed, and that he had mined about ten acres of coal from the Edmundson tract and paid royalty thereon.   He therefore refused to pay any more royalty until he was reimbursed for the coal thus mined.   An agreement was then entered into, of which the following are the material portions:

"Office of the Kittanning Coal Co.,
July 11th 1874.

"Whereas, There is now or appears to be, as between the Moshannon Land and Lumber Company, and the heirs of Dr. D. Houtz, deceased, a difference as to the division line between the said parties, known as the line of the Thomas Edmundson tract: Beginning at a pine tree and running north 46° 26' east to a post, which is the northeast boundary line between the estate of Dr. D. Houtz, deceased, and the Moshannon Land and Lumber Company.

"And, whereas, The Kittanning Coal Company have purchased from said Moshannon Company, all the coal right of said Thomas Edmundson tract, and also have leased from the said Dr. D. Houtz, in his lifetime, the coal on his lands (Howell and Bickham tracts).

"Now, therefore, We, the parties to the agreement, the said heirs of Dr. D. Houtz, deceased, viz.; D. R. Good, and Eliza B., his wife, George M. Brisbin, and Hannah E., his wife, and H. J. McAteer, and Clara, his wife, and the Kittanning Coal Company, by their general manager, J. R. Cameron, do agree to exchange a certain number of acres of land upon condition as follows:" * * * Then follows an agreement by which the Kittanning Coal Company agrees to pay for coal mined on Edmundson tract (10 acres and 38 perches), and in consideration thereof the heirs of Dr. Houtz agree to survey to the coal company 10 acres and 38 perches of their (Houtz) property, and that the agreement shall for ever settle the differences between the parties, not affecting the right as to true lines on the surface as between the Houtz heirs and the Moshannon Land and Lumber Company.

[Shillingford *v.* Good.]

It was alleged by the plaintiff, and evidence was introduced to show, that the above agreement was obtained by misrepresentation, suppression of the truth, falsehood and fraud, and was, therefore, void.

The defence alleged that this agreement established the line between the Edmundson and the Houtz tracts. The plaintiff on the contrary claimed that the single purpose of the agreement was to exchange ten acres and thirty-eight perches of land; that if the claim of the defendant was to prevail the heirs of Dr. Houtz had surrendered title to twenty-three acres of coal in the very heart of their land, worth, at that time, at least $23,000, and this, too, without a dollar of consideration, and without ever having the pretended new line run. The plaintiff contended, that a fair construction of the language of this agreement did not change or fix the true line between the tracts; that if the legal effect was to fix the real division line, then, that it was inoperative as a binding agreement upon the married daughters of Dr. Houtz, not having been acknowledged and that if otherwise binding it was void, as alleged above, for the reason that it was procured by misrepresentation and fraud. The various questions raised will be found in the assignments of error set forth below. The verdict was for plaintiff for $29,034.25. After judgment thereon defendant took this writ and alleged that the court, Dean, P. J., erred as follows:

1. In admitting testimony under the following offer: *Plaintiff* proposes to prove by the witness that he was employed as clerk and weighmaster by the person or company operating the Franklin colliery, opened on the land covered by the agreement between Dr. Houtz and H. H. Shillingford, defendant, already in evidence, from 1871 to 1875, and that false weights were used in weighing the coal mined and shipped, and that large deductions were also made from the quantities of coal mined, and that the reports made thereof to Dr. Houtz and to his trustee, the plaintiff, were false and of a much less number of tons than was actually mined and shipped, and that the said false weights were used and the said deductions made by direction of the general superintendent of the mine.

Defendant objected to any proof of deductions or any other proof affecting the quantity of coal mined prior to November 1873, the date of the death of Dr. Houtz, the trustee, plaintiff, not being entitled to rents accrued before the death of the testator. Evidence admitted.

2. In refusing defendant's first point: " The plaintiff is not entitled to recover from the defendant for any alleged breaches of covenant prior to the death of Dr. Houtz."

3. In charging: " The legal title to the coal leases and all money due upon them at the time of the testator's death, passed in our opinion to Dr. Good under these provisions of the will as fully as if Dr.

Houtz had assigned them to Good in his lifetime. They gave to the trustee the custody of the leases and the management of the estate in them for the uses specified in the will, so that in this action the plaintiff is in our opinion the proper party to sue for any balance due for coal mined, whether the coal was mined in the lifetime of Dr. Houtz and not paid for, or has been mined since."

4. In charging: "This agreement" (the agreement of 11th July 1874) "is utterly void so far as it purports to convey ten acres of coal land in exchange for ten acres of other coal land, and such land being the separate estate of married women, it could not be conveyed without a separate acknowledgment on their part." * * * The law treats the conveyance of a married woman, not separately acknowledged by her before a magistrate, a judge or justice of the peace, as absolutely void. The defendant cannot refuse payment for any coal mined on the ten acres which was to be given him in exchange for that alleged to have been paid for by him while mining on land not the plaintiff's; but if he mined over the line on his own land, and paid for the coal so mined, he must be allowed a credit therefor on any balance that may be yet due.

5. In refusing defendant's eighth point: "There is no evidence of fraud in the procurement of the agreement of the 11th July 1874, to be submitted to the jury."

6. In charging: "A fair construction of the agreement, it seems to us, must treat the Gwin line as the line of the Edmundson; and were there no evidence here as to the manner in which these signatures were obtained, it would conclusively establish the Gwin line as the line of the Edmundson." * * * * "If the case is with the defendant in this particular, i. e., if the agreement was not obtained by fraud, then you need not inquire further as to the location of the line on the ground. The Gwin line must be taken as the line."

7. In admitting evidence under the following offer: Plaintiff proposes to show that the witness was the acting representative of the Houtz heirs, and that the agreement of 11th July 1874 was brought to him by Lawshe and Cameron, the agents and superintendents of the Kittanning Coal Company, with the statement and assurance that it did not change or affect the lines of the Houtz lands beyond the exchange of the ten acres therein provided for, that before any of the parties signed it the witness had the last sentence added to the agreement to express more clearly, as he thought, the declared purpose and effect of the paper, and that upon the assurance so made the paper was signed; this offer for the purpose of contradicting J. R. Cameron, witness for defendant, and also for the purpose of defining the subject-matter of the paper and explaining the ambiguity appearing on its face.

8. In charging: "But if Cameron and Lawshe, or either of them, had procured the Gwin survey, had knowledge of the course

and distance of the line north forty-six degrees twenty-six minutes east three hundred and twelve perches, and the others had not such knowledge, and if they or either of them represented to Brisbin that this line was the line as laid down on the Houtz map, and thus by a false representation on which Brisbin relied, not knowing the true bearing of the line, tricked him and the others into signing the agreement, and then attached to it a map which showed the true location of the line to the land, the plaintiff would not be bound by the line in the agreement."

9. In admitting the evidence of H. J. McAteer, under the following offer:—

Plaintiff proposes to show by the witness, that Mr. Brisbin communicated to him, prior to the signing of this paper (the compromise agreement of July 1874), what Mr. Cameron and Lawshe had said, as to the purpose of the paper, and what was to be accomplished, and upon the faith of such communication, the witness and his wife signed the paper.

In admitting evidence under the following offer: Plaintiff proposes to prove by the witness that she is the wife of H. J. McAteer, and daughter of Dr. D. Houtz, deceased; that she signed the paper of July 12th 1874; that it was not read to her, nor its contents made known, and that she has no knowledge whatever of the lines of the land therein referred to (and that there was no map to the paper when she signed it).

11. In charging: "If this agreement was signed for the purpose of settling a disputed boundary, with the map attached or present when it was signed, it binds these parties, and although the agreement on its face does not necessarily disclose the exact location of the line, the agreement and the map put it beyond question."

13. In refusing defendant's third point:—

"The Kittanning Coal Company having entered into the possession of the coal leased to H. H. Shillingford, who was president of said company, and they having made the improvements and opened the mines as lessees of Dr. Houtz, and all the rent which was paid having been paid by said company, and settlements and compromises having been made by them as tenants of the plaintiff, facts inconsistent with the continuance of the defendant's tenancy, there can be no recovery against defendant for non-payment of rent by the Kittanning Coal Company."

15. In charging: "The plaintiff claims that he has, by the most indubitable evidence, established the fact that from the time the mines were opened, in February 1871, down to the commencement of this suit, there was practised upon Dr. Houtz in his lifetime, and upon him since his death, a fraud which infected the returns or nearly all the returns made. * * * If the case is with the plaintiff in this particular, if he has proven such fraud as warrants you in going behind the monthly returns, then you would

ascertain from the evidence what quantity of coal was mined and shipped under the lease from the land leased."

*S. S. Blair*, *J. M. Bailey* and *William Dorris*, for plaintiff in error.—The plain and obvious meaning of the agreement was an adjustment of a rent account. The representatives of Dr. Houtz did not convey, or attempt to convey, land or coal, for by virtue of the lease from Houtz, the Kittanning Coal Company already owned the coal, and the only right the trustee had was to the price of it. It was not, then, an unacknowledged conveyance of land by a married woman. The rent or price of the coal was personal, and at their disposal without acknowledgment, their husbands joining and consenting: Bond v. Bunting, 28 P. F. Smith 210; 2 Rop. Husband and Wife 184; Wright v. Brown, 8 Wright 224. An acknowledgment of the agreement was not necessary: Fryer v. Rishell, 3 Norris 521. It was a consentable line, the establishment of which is not governed by the Statute of Frauds and Perjuries, even if it had been a boundary of land, and the agreement had not been, as already shown, a mere settlement of a rent account: Bowen v. Cooper, 7 Watts 311; Kellum v. Smith, 15 P. F. Smith 86; Hagey v. Detweiler, 11 Casey 409.

The right of action on the contract for all breaches prior to the death of Dr. Houtz was in his executors, and the trustee could not sue: Bac. Ab. "Ex. and Ad.," 81; Bank of Pennsylvania v. Wise, 3 Watts 399; Cobel v. Cobel, 8 Barr 343; 2 Williams on Ex'rs., *700 (5 Am. ed.).; Haslage v. Krugh, 1 Casey 97; 1 Chitty's Pleading 214, 229.

*R. Bruce Petrikin* and *R. M. Speer*, for defendant in error.—As an unacknowledged agreement for the sale or exchange of land, the paper of 11th July 1874, is inoperative against the married daughters of Dr. Houtz: Miltenberger v. Croyle, 3 Casey 170; Rumfelt v. Clemens, 10 Wright 455; Kirk v. Clark, 9 P. F. Smith 479. A married woman has no capacity to contract for the sale of her land or to convey it, except in the precise statutory mode: Glidden v. Strupler, 2 P. F. Smith 400; Graham v. Long, 15 Id. 383; Moore v. Cornell, 18 Id. 320; Bond v. Bunting, 28 Id. 210; Railroad Co. v. Burson, 11 Id. 369. Fryer v. Rishell is distinguishable from this case.

It seems to have been the clear intention of Dr. Houtz, in appointing a trustee, to commit to him the care and management of all his coal lands, including the leases and their royalty, whether accrued or not, and the proceeds of the timber upon the land. This part of his estate he wholly withdraws from the dominion of his executors; provides for the payment by his trustee of several legacies from its income, and when this shall have been done and the leases shall have expired, the trust shall cease.

Nor can the affirmance of this judgment prejudice the beneficiaries under the will. After the payment of the specified legacies by the trustee, the balance goes to the three daughters, and it makes no difference to them whether it be recovered in the name of the trustee or the executors. They cannot sue in their own names.

Mr. Justice STERRETT delivered the opinion of the court, October 4th 1880.

The single question raised by the first three assignments of error is whether the trustee named in the will of Dr. Houtz can maintain an action on the contract for such breaches as are alleged to have occurred in the lifetime of the testator. As to those that occurred since his decease, it is conceded the trustee had a right to sue, but the defendant below contended that if any right of action accrued before, it vested exclusively in the executors; and *in his* first point the court was requested to charge that " the plaintiff is *not entitled to recover from the defendant for any alleged breaches* of covenant prior to the death of Dr. Houtz." The learned judge admitted testimony as to the prior breaches and refused the instruction prayed for.

By the contract of December 7th 1869, on which the action is based, Dr. Houtz, the party of the first part, agreed to lease certain tracts of land therein described to Mr. Shillingford, the defendant below, "for the purpose of mining, shipping and transporting coal from said lands and other lands owned and operated by the party of the second part, his heirs and assigns." In consideration whereof, Shillingford agreed " to proceed within thirty days to explore and prove the coal in said lands, and when the mines shall have been opened and all necessary improvements made, at the costs of the party of the second part, to operate the same in a workmanlike manner and pay for all coal mined and shipped from said tracts a royalty of fifteen cents per gross ton of twenty-two hundred and forty pounds." The agreement is silent as to the time within which the coal is to be taken out as well as the quantity to be mined within any given period, and *no time is fixed for the payment of the "royalty,"* but by their subsequent dealings, the parties treated it as payable monthly. After the mines were opened, monthly returns and corresponding payments were made to Dr. Houtz until his decease in November 1873. By his will, dated July 8th 1872, Dr. Houtz devised all his lands in Woodward township, Clearfield county, including the lands above mentioned, to his three daughters, and as to the coal contract with the defendant below, he directed as follows : " The coal leased thereon to remain in the hands and care of· my trustee, together with my L. & A. Morrison paper, maturing, until all legacies in this will are paid and term of leases expired." The legacies referred to aggre-

[Shillingford v. Good.]

gate over $160,000, including $50,000 to each of his daughters. As to some of the legacies and bequests contained in the will, the trustee is specially clothed with powers and duties which would otherwise belong to the executors. The testator manifestly intended that the duty of executing some of the provisions of his will should devolve on the executors and others on the trustee named by him; and if it can be fairly gathered from the will that, for all purposes connected with the trust, it was the intention of Dr. Houtz to commit his entire interest in the coal contract to the control and management of the trustee, and thus invest him with all the rights and powers pertaining thereto, which he himself possessed, there can be no doubt that the trustee was the proper party to sue for breaches which occurred before as well as after the testator's decease. This is substantially the construction put upon the will by the learned judge of the Common Pleas, who instructed the jury that the legal title to the coal leases and all money due upon them at the time of the testator's death, passed under the provisions of the will to Dr. Good, the trustee, who thereby acquired the right to the custody of the leases and the management of the estate in them, for the uses specified in the will, and consequently he was the proper party to sue for any balance due for coal mined, whether in the lifetime of Dr. Houtz or since. While the construction thus given to the will may not be entirely free from doubt, we think it is correct. It is certainly not in conflict with any of the provisions of the will; on the contrary, it harmonizes with all of them better than the construction contended for by the defendant below. In addition to this, the objection is purely technical and cannot affect the merits of the case as to either party. If the defendant below is liable for breaches of the contract, it can make no substantial difference to him whether he answers to the trustee for the whole of the damages, or to the executors for a part, and to the trustee for the residue. The executors concede to the trustee the exclusive right of action, and by writing filed in the case, have agreed, in case the judgment is affirmed, "to release and relinquish to the said defendant, his executors or administrators, any right or supposed right which they now have or ever had, to sue for, recover or receive any sum or moneys for any breaches of the covenants of said agreement." The defendant below is thus amply protected against any claim or suit by or in behalf of the executors. We discover nothing in the assignments relating to the right of action that would justify a reversal, after a full and fair trial on the merits.

The plaintiff's testimony, if believed by the jury, uncovered and exposed to full view repeated if not continuous acts of deception and fraud of a gross character in making up and rendering accounts of the products of the mines. The testimony on this subject was fairly presented and submitted to the jury with well guarded

14 NORRIS—3

[Shillingford *v.* Good.]

instructions. They were told that the monthly returns—purporting to be correct statements of the coal mined each month—which were received without objection and payments made thereon, were in the nature of settlements by the parties; and, in the absence of full and satisfactory evidence of fraud or mistake, they were conclusive; that "if there was any irregularity or cause of complaint, at the time of these monthly returns and payments, it was the duty of the plaintiff to then make known his objections, or he is concluded by the original amounts as fully as if a formal and final settlement of accounts had been made at the end of each month. To get behind these returns now the plaintiff must, by clear and indubitable evidence, prove that these returns were false and fraudulent." The main question of fact was thus submitted in terms quite as favorable to the defendant below as he could reasonably ask.

When considered in connection with the context, there is no error in that portion of the charge embraced in the fourth assignment. The agreement of July 11th 1874, therein referred to, was offered and admitted "for the purpose of establishing the line claimed by the defendant as the division line of the coal on the Edmundson and Howell tracts." While the learned judge properly held that the agreement was inoperative as a conveyance of land for want of the required acknowledgment, he recognised its effect, if fairly procured, as evidence of a settlement of the disputed boundary line by saying, in the same breath, that "there is nothing in the law which forbids or prevents a married woman from settling a disputed boundary line without a formally acknowledged conveyance." Proper effect was given to the agreement, and the questions of fact relating to the true location of the division line between the Edmundson and the Howell tracts, were fully and fairly submitted to the jury.

The fifth to the twelfth assignments inclusive relate to the question of fraudulent procurement and use of the agreement of July 1874, so far as it was claimed to be a settlement of the division line, and the submission of that question to the jury. The plaintiff below recognised the validity of the agreement, as an exchange of the triangular piece of coal on his side of the line for a corresponding amount of coal alleged to have been mined on the other side and paid for by mistake; but he contended that it never was the purpose of the agreement to change or establish the location of the line; that, on the contrary, the parties who acted in the interest of the defendant below, in procuring its execution, expressly disclaimed any such object. Without referring specially to the several items of testimony on this branch of the case, it is sufficient to say that it tended to sustain the position of the plaintiff below and to prove that the agreement, so far as it is now claimed to be a binding settlement of the disputed boundary line according to

[Shillingford *v.* Good.]

the course and distance therein specified, was artfully and deceit-
fully obtained. There can be no question that the testimony was
competent and sufficient to carry the question of fraudulent pro-
curement to the jury. It makes no material difference that some
of the misrepresentations complained of were made long before the
agreement was signed. If their effect continued and was operative
at the time the agreement was signed, it is enough. In Stubbs *v.*
King, 14 S. & R. 206, it is said, "Where a continued misappre-
hension of material facts has been induced on the part of the one
by the misrepresentations of the other, it is obvious that the execu-
tion of the writing ought not to extinguish the right of the injured
party to show the fraud by which his assent to the contract was
obtained."

The remaining assignments are not sustained.

Judgment affirmed.